UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
L.K., individually and on behalf of minors N.S., and S.S.,

Plaintiffs,

**MEMORANDUM AND ORDER**
14 CV 5730 (DRH) (AKT)

-against-

SEWANHAKA CENTRAL HIGH SCHOOL DISTRICT, SEWANHAKA CENTRAL HIGH SCHOOL DISTRICT BOARD OF EDUCATION, MICHELE SANZONE, individually and in her official capacity, STEPHEN RUSSO, individually and in his official capacity, MELISSA ARGAMAN, individually and in her official capacity, CARYL ORIS, individually and in her official capacity, REGINA AGRUSA, individually and in her official capacity, and WARREN MEIERDIERCKS, individually and in his official capacity,

Defendants.
---------------------------------------------------------------------X

**APPEARANCES:**

**THE LAW OFFICE OF STEVEN A. MORELLI, P.C.**
Attorneys for Plaintiff
1461 Franklin Avenue
Garden City, New York 11530
By: Steven A. Morelli, Esq.

**SOKOLOFF STERN LLP**
Attorneys for Defendants
179 Westbury Avenue
Carle Place, New York 11514
By: Steven C. Stern, Esq.
Mark A. Radi, Esq.

**HURLEY, Senior District Judge:**

Plaintiff L.K., the mother of plaintiffs N.S. and S.S. (collectively "Plaintiffs"), commenced this action on behalf of herself and her daughters against the Sewanhaka Central High School District (the "District") and its administrators and employees in their official and

individual capacities (collectively "Defendants"), alleging that Defendants discriminated and retaliated against them on the basis of N.S. and S.S.'s medical disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983 ("Section 1983"). Additionally it is alleged that Defendants Sanzone, Russo, Argaman, Oris, Agrusa and Meierdiercks retaliated against Plaintiffs for L.K.'s expression of her views regarding a matter of public concern, thereby violating her individual rights under the First Amendment of the United States Constitution pursuant to Section 1983. Plaintiffs also allege that Defendants Sanzone, Russo, Argaman, Oris, Agrusa, and Meierdiercks conspired against them and neglected to aid in preventing the commission of the conspiracy pursuant to 42 U.S.C. §§ 1985 ("Section 1985") and 1986 ("Section 1986"). Finally, Plaintiffs claim that Defendants District and Sanzone, Russo, Argaman, Agrusa, and Meierdiercks, acting in their official capacities, made false misrepresentations of fact and are therefore liable for fraud under New York State common law.

Presently before the Court is Defendants' motion to dismiss Plaintiffs' complaint in its entirety with prejudice for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). In support of their motion, Defendants advance several arguments as to why each of Plaintiffs' claims should be dismissed, including failure to exhaust administrative remedies, statute of limitations, lack of standing, and failure to state a claim. For the reasons set forth below, the motion to dismiss is granted.

## BACKGROUND

The following facts are taken from the complaint.

### I. The Parties

Plaintiff L.K.[1] is the mother of N.S. and S.S. (collectively "daughters"), aged twenty and seventeen, respectively, on September 30, 2014, the date on which the complaint was filed. (Compl. ¶¶ 17-19; ¶ 1.) L.K. purports to bring this action on behalf of both of her daughters. The Plaintiffs reside together in the District. (*Id.* ¶ 17-19.) The daughters are students at New Hyde Park Memorial High School (the "School") within the District and are presently receiving homebound instruction from the District due to their medical disability known as Chronic Fatigue Syndrome (hereinafter "CFS"). (*Id.* ¶¶ 1-2; 11.)

Defendant Michele Sanzone ("Sanzone") is the District Section 504 Committee Chairperson. (*Id.* ¶ 7.) During the relevant time period, Defendant Stephen Russo was the School psychologist. (*Id.* ¶ 23.) Defendant Melissa Argaman ("Argaman") is the School guidance counselor. (*Id.* ¶ 24.) Defendant Caryl Oris ("Oris") is the District psychiatrist. (*Id.* ¶ 25.) Defendant Regina Agrusa ("Agrusa") is the District Director of Pupil Personnel Services. (*Id.* ¶ 7.) During most of the time period relevant to this complaint, until August 2011, Defendant Warren Meierdiercks ("Meierdiercks") was the District Superintendent. (*Id.* ¶ 27.)

### II. Factual Background

#### A. Plaintiffs' Illness

In November 2008, N.S. contracted a debilitating viral illness that was believed at the time to be mononucleosis. (Compl. ¶ 28.) S.S. contracted the illness from her sister in

[1] The complaint sometimes refers to L.K. as Ms. K.

December 2008, but was diagnosed with viral meningitis. (*Id.* ¶ 29.) After they missed over one month of school, it was determined that both girls required home tutoring. (*Id.*) S.S., who was a sixth grade student within the New Hyde Park Garden City Park Union Free School District at this point, was granted full home tutoring as required for the remainder of the 2008-2009 academic year. (*Id.* ¶ 30.) However, the District only provided N.S. with a temporary period of home instruction. (*Id.* ¶ 31.)

In January 2009, L.K. brought N.S. and S.S. to a pediatric specialist, who diagnosed them with CFS, a complex disorder that is characterized by profound fatigue and various physical and/or cognitive impairments, and which presently has no known prognosis for full recovery. (*Id.* ¶¶ 2-3; 33.) The doctor recommended home tutoring for both girls and gradually adding one class back into N.S.'s schedule at a time, as N.S. suffered from more physical symptoms of CFS than her younger sister. (*Id.* ¶¶ 34; 4.)

**B. The First Request for Accommodations for N.S.**

In March 2009, L.K. spoke with Defendant Sanzone and requested accommodations for N.S. (*Id.* ¶ 36.) On March 6, 2009, Sanzone held a Section 504 Committee meeting in order to provide N.S. with partial home tutoring. (*Id.* ¶ 38.) L.K. was neither present at nor contacted about this meeting, where it was determined that N.S. was a student with a disability who required accommodations. (*Id*). The resulting Section 504 Individualized Accommodation Plan ("504 Plan") involved "partial home tutoring and partial in-school instruction, as suggested by Dr. Lee." However, "the 504 Plan required N.S. to attend school for four periods and then receive homebound services for two classes. After one week her schedule was to be increased to five periods and she was to receive homebound services for one class. After two weeks, her

homebound instruction was to be discontinued and N.S. would return to a full time schedule." (*Id.* ¶ 39-40.) This was too fast-paced for N.S. who was struggling physically and eventually caused her to relapse. (*Id.* ¶¶ 40, 44.) Sanzone told L.K. that N.S. would not receive any credits for her work during the 2008-2009 school year if she did not return to all of her classes by June. (*Id.* ¶ 41.) Additionally, Sanzone required L.K. to obtain "a letter from Dr. Lee which would meet her requirements," which L.K. did, despite her objections to the plan, out of fear that N.S. would not receive school credit without it. (*Id.* ¶¶41-42). Further, Sanzone altered the meeting sign-in sheet to misrepresent L.K.'s presence at the 504 Meeting. (*Id.* ¶ 43.)

**C. The 2009-2010 Academic Year**

On June 18, 2009, the 504 Committee reconvened to discuss N.S.'s condition. At the meeting, "Sanzone unilaterally removed N.S. from receiving 504 accommodations" and wrote that "N.S.'s '*mother and her doctor believe that this student will be able to handle a full schedule next year. Therefore no accommodations will be needed*.' This written statement was also fraudulent." (*Id.* ¶¶ 46-47 9emphasis in original).) Rather, "Salzone decided not to provide services to N.S. without agreement from Ms. K or any physicians. Any and all input from Ms. K regarding CFS was disregarded, and no evaluation of N.S.'s physical ability was conducted." (*Id.* ¶¶ 47.) When the removal of services was protested by Ms. K, Sanzone assured her that it was protocol to remove services at the end of each academic year, and that N.S. would be reevaluated in the following school year if she required accommodations. "These intentionally deceptive statements made by Defendant Sanzone to prevent Ms. K from exercising N.S.'s rights." (*Id.* ¶ 48.)

N.S. was not reevaluated at the start of the 2009-2010 school year and no meeting was scheduled, as promised. After one day of school N.S. physically collapsed and missed the rest of the school week. "Despite knowing that N.S. was missing multiple days of school and struggling with her current in school instruction, Defendant Sanzone never contacted N.K. as promised to schedule a meeting." (Compl. ¶¶ 50-51.) In September 2009, L.K. met with Defendant Russo to discuss N.S.'s schedule. "After a long discussion" he assured L.K. that he would reduce N.S.'s schedule to fit her needs, and would not require an official 504 Plan or N.S.'s written diagnosis to do so. (*Id.* ¶ 53.) Russo "removed [N.S.] from her challenging academic classes" and "made [her] repeat Geometry class, which she had already passed." (*Id.* ¶ 54.) Even with the truncated schedule, N.S. had relapses causing her to be absent for several days at a time. (*Id.* ¶ 55.)

In October 2009, Russo instructed N.S. to see a therapist, "insist[ing] that N.S. was suffering from depression." (*Id.* ¶ 59.) Despite disagreement from other therapists and N.S.'s parents, N.S. was diagnosed with and treated for depression. (*Id.*) Russo made clear his disbelief of N.S.'s medically diagnosed disability. (*Id.* ¶ 60.)

At this time, S.S. had been regularly attending school, but the neuro-cognitive impairments of her CFS caused her to suffer from absence seizures, a lack of coordination, and an overall weakened body state, which caused her to endure injuries and infections. (*Id.* ¶¶ 61-62.) When L.K. expressed her concern that her daughters' cooperation with the School's demands was aggravating their conditions, "Defendants began to accuse L.K. of creating her daughters['] injuries or intentionally making them sick and keeping [them] out of school." (*Id.* ¶ 63.) Specifically, Russo, Sanzone, and Argaman told N.S. and S.S. that they could tell by looking at them that they were not sick. (*Id.* ¶ 71.)

**D. The PINS Petition and First CPS Report**

In March 2010, "despite telling L.K. that N.S.'s absences were medically excused," Sanzone, Russo and Argaman initiated a Person In Need of Services (hereinafter "PINS") Petition. N.S. was required to see a counselor. (*Id.* ¶ 65.) "After the PINS investigation was initiated Mr. S, N.S. and S.S.'s father called Defendants and inquired into the problem. Mr. S and Ms. K are divorced. Mr. S was told by Defendants Sanzone and Russo that Ms. K was intentionally keeping their daughters sick, and that he should contact Child Protective Services ("CPS") because "*it would be better if it came from him*." "[They] manipulated Mr. S. into filing a CPS report on Ms. K." (*Id.* at ¶ 66 (emphasis in original).)

N.S.'s PINS counselor determined that N.S. was severely disabled, and when L.K. told her that N.S. had never been evaluated by the District for her disability, the counselor informed L.K. that she "get[s] a lot of that from this District." (*Id.* ¶ 68.) Toward the end of the 2010 school year, the PINS counselor insisted that L.K. "send a written request for a psycho-educational evaluation to be performed by the school. this way the school would have to assess N.S.'s needs for accommodations. When L.K. told Russo of her plan, he told her "*we already know what is really going on here*," "implying that she was intentionally keeping her daughters sick." (*Id.* ¶ 69 (emphasis in original).)

In the 2010 spring semester, N.S. and S.S. learned that their teachers were never informed of their disability and marked them as "cutting" when the girls needed to rest in Russo's office, as they were instructed to do when needed. (*Id.* ¶ 70.) Around this time, Defendants requested that L.K. and N.S. attend a meeting at the School, where Russo and Argaman explicitly stated that they do not believe N.S.'s disability. (*Id.* ¶ 72.) Shortly thereafter, Defendants searched N.S.'s

locker for drugs, to no avail. (*Id.* ¶ 73.) Throughout this time period, Defendants ignored letters from doctors reaffirming N.S. and S.S.'s disability and recommending home tutoring, which continued to be denied. (*Id.* ¶ 74.)

**E. The June 2010 CSE Meeting**

In April 2010, L.K. requested a Committee for Special Education (hereinafter "CSE") meeting in order to secure homebound instruction for N.S. and S.S. (*Id.* ¶ 75.) The CSE meeting was held on June 7, 2010, and the Committee determined that N.S. was not eligible for an Individualized Education Plain (hereinafter "IEP") based upon an evaluation that was conducted for a learning disability. (*Id.* ¶¶ 76-77.) However, N.S. suffered from a physical illness for which she required alternate access to education provided by a 504 Plan, not an IEP. (*Id.* ¶ 77.) Throughout the meeting, "the Committee members silenced L.K." and "disregarded" what N.S.'s PINS counselor shared about her condition. (*Id.* ¶¶ 76-77.) N.S. received near failing grades in all of her classes due to incompleteness for the 2009-2010 school year. "At this time N.S. was effectively denied a year and a half of schooling." (*Id.* ¶ 79.)

**F. The 2010-2011 Academic Year**

In September 2010, the start of the new academic year, N.S.'s teachers began to refuse her permission to use the bathroom, and Russo, Sanzone and Argaman allegedly instructed her teachers to mark N.S. as "cutting" when she did so. (*Id.* ¶ 81.) In October 2010, Defendants called L.K. to schedule a case conference in order to establish a 504 Plan. (*Id.* ¶ 83.) At the conference, a 504 Plan was not even discussed. (*Id.*) Rather, Defendants asserted that N.S. had behavioral and attendance issues. (*Id.*)

On October 25, 2010, Sanzone and Argaman arrived at L.K.'s home unannounced to check on N.S. (*Id.* ¶ 86.) Argaman told L.K. that the District "*would never provide services to [her] daughters*," and both Defendants threatened her that if she failed to provide a letter of intent to home school her children by the end of the week, additional CPS reports would be filed. (*Id*. (emphasis in original).) At this time, L.K. requested a 504 meeting and had additional doctor's reports sent to the District. (*Id.* ¶ 87-88.)

**G. The November 2010 Meeting and Subsequent Evaluations**

"In or around November 2010, [L.K.], and Mr. S., [together with a Single Point of Access worker and a family advocate] attended the supposed 504 Committee Meeting. However, this was in no way a 504 Committee Meeting and it was fraudulently misrepresented to Plaintiffs as such." (*Id.* ¶ 89.) The Defendants refused to accept any documentation of N.S. or S.S.'s CFS diagnosis and no plan was developed for N.S. (*Id.* ¶¶ 89-90.) Sanzone assured L.K. that if N.S. and S.S. underwent a psychiatric evaluation by Dr. Oris, they would be provided with home tutoring, and L.K. reluctantly agreed in order to get services for her daughters. (*Id.*)

On November 30, 2010, Dr. Oris evaluated N.S. and S.S., and falsely told L.K. that the purpose of the evaluation was to determine whether her daughters' needs would be met under the conditions of home tutoring. (*Id.* ¶ 91.) While L.K. was not permitted to be in the room during N.S. and S.S.'s evaluations, Sanzone and Argaman were present and allegedly manipulated the process by speaking over both girls. (*Id.*) "Unsurprisingly," Dr. Oris produced a "negative report." (*Id.* ¶ 92.) In December 2010, Sanzone informed L.K. that homebound instruction and all accommodations had been denied because "the girls were not receiving proper recovery

treatments." (*Id.* ¶¶ 92; 94.) L.K. informed Sanzone that this determination violated Section 504 as there are no proven treatments to cure CFS. (*Id.* ¶¶ 92; 95.)

In January 2011, L.K. took N.S. and S.S. to see Dr. Martin Fisher, the District's consulting physician, who has a subspecialty in adolescent CFS. He was "shocked" that the District had never contacted him about N.S. and S.S. (*Id.* ¶¶ 99-100.) After a four-hour evaluation, Dr. Fisher diagnosed both N.S. and S.S. with CFS. (*Id.* ¶ 100.) When he called to inform the District and recommend full-time home tutoring, Dr. Fisher was met with hostility and later told L.K. that "they hate [her] there." (*Id.* ¶ 101.) Dr. Fisher fought with Agrusa for three weeks, but no services were provided to N.S. and S.S. as a result. (*Id*). Dr. Fisher agreed to send written recommendations to the District in support of services for N.S. and S.S., but under the condition that Plaintiffs attend regular therapy sessions, as instructed by the District and Agrusa. (*Id.* ¶ 102.) After receiving Dr. Fisher's letter, the District granted both girls home tutoring. (*Id.* ¶ 103.)

**H. N.S. and S.S. Begin Homebound Instruction**

N.S. and S.S. began their homebound instruction in February 2011, but Agrusa shortened their class schedules and they were not provided tutoring for math and science. (*Id.* ¶ 104.) Further, the tutors were not provided with an instruction plan or curriculum, and stopped visiting the house after several sessions. (*Id.* ¶¶ 106-107.) Agrusa subsequently told L.K. that a plan was in place pursuant to written instructions. (*Id.* ¶ 108.) Yet, this plan was never provided to L.K. upon her requests, or to the tutors themselves. Following this discussion between L.K. and Agrusa, the District reported L.K. to CPS, maintaining that she was refusing tutoring for N.S. and S.S. (*Id.* ¶ 109.)

## I. OCR Investigations and Additional CPS reports

As a result of the harassment from CPS and the Defendants' failure to respond to L.K.'s concerns regarding a plan for services, L.K. filed an action with the United States Department of Education Office for Civil Rights (hereinafter "OCR") on February 16, 2011. (*Id.* ¶¶ 110-111.) The complaint alleged that the District was discriminating against N.S. and S.S. on the basis of their disability and had taken retaliatory action against them. (*Id.* ¶ 111.)

In mid-March 2011, while waiting for the District to provide services, L.K. decided to enroll N.S. and S.S. in the Keystone Program, an online instruction program. (*Id.* ¶ 113.) In the meantime, the District initiated unsubstantiated CPS investigations, which returned negative results. (*Id.* ¶ 114.) On April 12, 2011, L.K. and Mr. S. met with Superintendent Meierdiercks, who failed to provide any constructive response to their concerns about their daughters falling behind in school. (*Id.* ¶ 115.)

At this point, the CPS investigations had grown unbearable, so L.K. approached the School Principal in hopes of preventing the District from harassing her and her children with such reports. (*Id.* ¶ 116.) The Principal informed L.K. that the only way the District would stop reporting her to CPS was if she withdrew N.S. and S.S. from the School for medical reasons. (*Id.* ¶ 117.) As a result, on April 13, 2011, L.K. signed her daughters out of school and obeyed the Principal's directions to indicate the Keystone Program as the name of their new school on the sign-out form. (*Id.* ¶¶ 118-119.) L.K. did not intend to home school her daughters, but rather withdrew them from the District because she was told she must do so in order to halt the CPS reports. (*Id.* ¶¶ 119; 123.) Two days later, Agrusa sent L.K. a letter informing her of home

schooling requirements, and continued to send L.K. letters throughout the summer of 2011, demanding compliance with documentation. (*Id.* ¶¶ 120; 124.)

"On April 19, 2011, OCR investigated several violations. First the District failed to provide N.S. with trigonometry assignments while on home instruction during the 2010-2011 academic year. Second the harassing reports to CPS in January 2011; and third, the withdrawal of S.S. from algebra and Earth Science courses during the 2010-2011 academic year." (*Id.* ¶ 125.) "On May 4, 2011, during the investigation, Ms. K reported a violation of Section 504 of the Rehabilitation Act, stating that the District failed to perform a medical evaluation of N.S. and S.S. for their suspected disability, but rather just denied both girls both girls accommodations of a 504 Plan. On June 22, 2011, OCR initiated an investigation into this complaint." (*Id.* ¶ 127.)

**J. October 2011 504/CSE Meeting and OCR Determination**

On August 14, 2011, L.K. wrote a letter to Dr. Ralph Ferrie, Superintendent Meierdiercks' new replacement, regarding her daughters' situations and in October 2011 both L.K. and Mr. S. met with him to discuss their daughters. (*Id.* ¶¶ 128; 130.) On October 15, 2011, an "impromptu joint 504/CSE meeting was held," where N.S. was provided with an IEP and S.S. with a 504 Plan for home instruction. (*Id.* ¶ 131.) However, N.S. and S.S. were not reevaluated, and the determinations made at this meeting were based on the same medical diagnoses from which they were previously denied services. (*Id.*)

Shortly thereafter, on October 27, 2011, OCR determined that the District was in violation of 34 C.F.R. § 104.35 for failing to abide by federal requirements in determining whether N.S. and S.S. required accommodations. The OCR report "indicated that the District

knowing that they were in violation of federal law, agreed to hold a 504 meeting to determine whether or not the girls needed special education or related services." (*Id.* ¶¶ 132-134.)

**K. Present State of N.S. and S.S.'s Homebound Instruction**

From October 15, 2011 to the present, the District has been providing both N.S. and S.S. with homebound instruction. (*Id.* ¶ 137.) Yet, despite the recommendations of tutors, doctors, and CFS advocates, the District has not developed a tracking plan with a condensed curriculum in order to ensure that N.S. and S.S. are able to graduate from high school after losing approximately two years of schooling. (*Id.* ¶¶137-140.) L.K. inquired about expedited instruction schedules at both the May 2013 and June 2014 CSE meetings, and was not provided with a response to her inquiries until after both meetings had concluded. (*Id.* ¶¶ 141-143.) The New York State Department of Education later informed L.K. that the District's response was false, and that contrary to its assertion, there are no required hours for completion of a subject in order to receive a high school diploma. (*Id.* ¶ 145.) The District also informed L.K. that both of her daughters must take June Regents examinations because the State does not offer the same tests in August. (*Id.* ¶ 155.) L.K. later found out that this wass also false information, as the Regents examinations are offered in August. (*Id.*) Additionally, the District has failed to incorporate PSAT/SAT/ACT preparation into its home instruction, which is offered to all other students free of charge. (*Id.* ¶ 156.)

At the June 2014 meeting, the Committee members emphasized that it would be impossible for both N.S. and S.S. to complete the necessary coursework to graduate before the school year in which they each turn twenty-one years old. (*Id.* ¶ 147.) Once a student turns twenty-one years old, a school district is no longer legally required to provide him or her with

instruction. (*Id.* ¶ 148.) The District presented N.S. and S.S. with the option of a General Educational Development Certificate (hereinafter "GED"), although the New York State Education Department regards the GED as an option only for those students whose academic weaknesses prevent them from being able to pass New York State Regents exams. (*Id.* ¶¶ 149-151.) Further, school districts are required to provide accommodations that make it possible for academically capable students with IEP's to graduate with a Regents diploma, without being limited by their medical disability. (*Id.* ¶ 152.) The District now claims that N.S. and S.S. are taking too long to complete their high school education, but it never offered them a path to completion that is attainable by children with CFS. (*Id.* ¶¶ 154; 158.)

## DISCUSSION

### I. Legal Standard: Rule 12(b)(1) Motion

A case may properly be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000). "In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a 'plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.' " *MacPherson v. State St. Bank & Trust Co.*, 452 F. Supp. 2d 133, 136 (E.D.N.Y. 2006) (quoting *Reserve Solutions Inc. v. Vernaglia*, 438 F. Supp. 2d 280, 286 (S.D.N.Y. 2006)), *aff'd*, 273 F. App'x 61 (2008); *accord Tomaino v. United States*, 2010 WL 1005896, at *1 (E.D.N.Y. Mar. 16, 2010). "On a Rule 12(b)(1) motion, the court may consider matters outside the pleadings, including affidavits, documents, and testimony if necessary." *Tsanganea v. City Univ. of N.Y.*, 2008 WL 4054426, at *3 (S.D.N.Y. Aug. 28, 2008) (citing *Kamen v. Am. Tel. & Tel. Co.*, 791

F.2d 1006, 1011 (2d Cir.1986)), *report and recommendation adopted*, 2008 WL 4548857 (S.D.N.Y. Oct. 8, 2008).

## II. Legal Standard: Rule 12(b)(6) Motion

In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) the Supreme Court clarified the pleading standard applicable in evaluating a motion to dismiss under rule 12(b)(6).

The Court in *Twonbly* disavowed the well-known statement in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. at 562. Instead, to survive a motion to dismiss, a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id*. at 555 (citations and internal quotation marks omitted).

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court provided further guidance, setting forth a two-pronged approach for courts deciding a motion to dismiss. First, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Thus,

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555)).

Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The Court defined plausibility as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id*. at 678 (quoting Twombly, 550 U.S. at 556-57) (internal citations omitted). In determining a motion to dismiss, a court's "review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 191 (2d Cir. 2007).

## III. Exhaustion of Remedies and Subject Matter Jurisdiction

### A. The IDEA

The Individuals with Disabilities Education Act ( "IDEA") requires states receiving federal funding to provide a “free appropriate public education” to children with disabilities. 20 U.S.C. §1412(a)(1)(A). A free appropriate public education consists of special education and related services that are provided in accordance with an individualized education program (“IEP”). 20 U.S.C. §1401(9). The IEP is a written document that “sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that

performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *K.H. v.New York City Dep't of Educ*., 2014 WL 3866430, at *1 (E.D.N.Y. Aug. 6, 2014) (quoting *Honig v. Doe*, 484 U.S. 305, 311,108 S.Ct. 592, 98 L.Ed.2d 686 (1988)).

The IEP must be developed by a team "including the child's parents, teachers, representatives of the district, and, where appropriate, the child." *Id*. (citing 20 U.S.C. § 1414(d)(1)(B)). The IDEA also established procedural safeguards for the parents of a child with special needs. 20 U.S.C. § 1415. In particular, the parent has the right to bring a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id*. at § 1415(f). If the school district does not resolve the complaint, the parent has a right to a "due process hearing." *Id*. New York Education Law provides for two levels of administrative review. First, a local school district appoints an impartial hearing officer ("IHO") to conduct a Due Process hearing. N.Y. Educ. Law § 4404(1)(a) (McKinney). Second, either party can appeal the IHO's decision to a State Review Officer ("SRO"). N.Y. Educ.Law § 4404(2). Subject to exhaustion and statute of limitations requirements, the IDEA provides that "[a]ny party aggrieved by the findings and decision made" in the administrativedue process proceedings may bring a civil action in federal court "with respect to the complaint presented" in the administrative proceedings. *Piazza v. Florida Union Free Sch. Dist*, 777 F. Supp. 2d 669, 679 (S.D.N.Y. 2011) (quoting 20 U.S.C. § 1415(i)(2)(A)).

**B. The IDEA and Exhaustion**

The IDEA requires an aggrieved party to exhaust all administrative remedies before commencing a federal civil action, and "a plaintiff's failure to exhaust administrative remedies

under the IDEA deprives a court of subject matter jurisdiction." *See, e.g., J.S. ex rel N.S. v. Attica Cent. Sch*., 386 F.3d 107, 112 (2d Cir. 2004); *Polera v. Board of Educ. of Newburgh Enlarged City Sch. Dist*., 288 F.3d 478, 483 (2d Cir. 2002); *Baldessarre v. Monroe-Woodbury Cent. Sch. Dist*., 496 F. App'x 131, 133 (2d Cir. 2011). As noted earlier, the IDEA "ensure[s] that all children with disabilities have access to a free and public education . . . ." and provides the parents of disabled children with an opportunity to challenge "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free and public education to such child." 20 U.S.C. § 1400(d)(1)(A) (2010); 20 U.S.C. § 1415 (b)(6)(A) (2005). The purpose of the IDEA's exhaustion requirement is to prevent a parent from sidestepping the expertise of education professionals, who are better suited to handle challenges to educational services than the federal courts. *See Hope v. Cortines*, 69 F.3d 687, 688 (2d Cir. 1995).

It is undisputed that the Plaintiffs in this case failed to exhaust the proper administrative remedies available to them. (Pls. Mem. in Opp. at 7-9.) Plaintiffs argue, however, that their failure to exhaust administrative remedies does not deprive this Court of jurisdiction over their retaliation and discrimination claims brought under the ADA and Section 504 because (1) they do not allege any violation of the IDEA and are thus not subject to the exhaustion requirement; and (2) their failure to exhaust should be excused. (*Id.*)

Discrimination and retaliation claims fall within the scope of the IDEA and are subject to the exhaustion requirement where the gravamen of the claims constitute "grievances related to the education of disabled children." *Stropkay v. Garden City Union Free Sch. Dist*., 2014 WL 6778397, at *3 (2d Cir. Dec. 3, 2014) (citing *Polera*, 288 F.3d at 481). Here, the Plaintiffs claim

that on the basis of N.S.'s and S.S.'s disabilities, they have been denied the services that would provide them with an appropriate education. "To paraphrase the Second Circuit, [t]he IDEA is intended to remedy precisely the sort of claim made by [Plaintiffs]: that a school district failed to provide [a student] with appropriate educational services" by failing to properly evaluate her and develop a 504 Plan to suit her academic needs. *Camac v. Long Beach City Sch. Dist.*, 2011 WL 3030345, at *10 (E.D.N.Y. July 22, 2011) (citing *Polera*, 288 F.3d at 488). While the Plaintiffs do not bring their claims under the IDEA itself, the statute specifically provides that plaintiffs with grievances related to the education of disabled children must exhaust their administrative remedies before commencing a lawsuit, "even if their claims are formulated under a statute other than the IDEA." 20 U.S.C. § 1400 (2010). The Second Circuit has held that this exhaustion requirement applies equally to relief sought under federal statutes such as the ADA, Section 504, and Section 1983 if such relief would also be available under the IDEA. *See*, *e.g.*, *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240 (2d Cir. 2008); *J.S. v. Attica Cent. Sch.*, 386 F.3d 107, 112 (2d Cir. 2004) (finding that plaintiff's claims under the Rehabilitation Act were subject to the IDEA exhaustion requirement); *Hope*, 69 F.3d at 688 (concluding that claims brought under the ADA were subject to the IDEA's exhaustion requirement).

In addition to their request for compensatory, emotional, psychological and punitive damages, Plaintiffs request "any other relief to which they are entitled." In *Camac*, 2011 WL 3030345, at *10, similar open-ended language in the plaintiffs' request for relief was construed to seek relief that is also available under the IDEA, and thus the claims were bound by the IDEA's exhaustion requirement. Although Plaintiffs in the case at bar request monetary damages, which the Second Circuit has affirmed are not available under the IDEA, and although they do not

explicitly request injunctive relief, Plaintiffs are not entitled to bypass the IDEA's administrative exhaustion rule. *See Cave*, 514 F.3d at 247 (citing *Polera*, 288 F.3d at 483-486). Rather, it is "the theory behind the grievance" of a disabled student regarding her educational program that triggers the exhaustion rule. *Baldessarre*, 496 F. App'x at 133 (quoting *Cave*, 514 F.3d at 246).

Where, as here, a plaintiff's claim relates to the placement or classification of his or her child, courts have applied the exhaustion requirements under the IDEA even when the claims seeks compensatory relief not available under the IDEA. *See*, *e.g.*, *Frank v. Sachem School Dist.*, –F. Supp. 3d –, 2015 WL 500489, *15 (E.D.N.Y. Feb. 5, 2015) (plaintiff was not excused from IDEA's exhaustion requirement because she sought only compensatory and punitive damages not available under the IDEA as she was alleging deprivation of educational services falling "squarely within the ambit of Due Process hearing afforded by the IDEA"); *M.A. v. New York Dep't of Educ.*, 1 F. Supp. 3d 125, 132 (S.D.N.Y.2014) ("Plaintiffs challenge the content of W.A.'s educational program and whether the program was the least restrictive environment; these claims thereby fall squarely within the IDEA and require exhaustion."); *Baldessarre v. Monroe–Woodbury Cent. Sch. Dist.*, 820 F. Supp. 2d 490, 505 (S.D.N.Y.2011) (applying exhaustion requirements of the IDEA to a plaintiffs' ADA claims because their claims "all relate to the identification, evaluation, or educational placement of Daniel, or his treatment by his teacher because of his disability, and therefore these claims all invoke Daniel's right to a free appropriate public education."), *aff'd*, 496 Fed. Appx. 131 (2d Cir. 2012). Plaintiffs are not excused from the exhaustion requirement merely because the remedies that they specifically list in their complaint are unavailable under the IDEA. *See Camac*, 2011 WL 3030345, at *10.

Plaintiffs cite *Preston v. Hilton Central School District*, 876 F. Supp. 2d 235, 241 (W.D.N.Y. 2012) for the proposition that since the ADA and Rehabilitation Act address discrimination against disabled students, while the IDEA addresses special education and related services, their claims do not fall within the ambit of the IDEA and thus they were not required to exhaust administrative remedies. In *Preston*, the Court found the IDEA's exhaustion requirement inapplicable because the claim was not a denial of a free appropriate education but rather a request for damages based on the District's alleged indifference to the disability-based and gender-based discrimination. (*Id.* at 241 n.1.) Here, in contrast, the gravamen of the complaint is the denial of a free appropriate education as demonstrated by Plaintiffs' argument that:

> [d]ue to Defendants[sic] constant denial of the girls' medically diagnosed disability of CFS, the Defendants failure to provide adequate services under a 504 plan or IEP, and the Defendants intentional misrepresentations to Plaintiff L.K. blocking her from the administrative process, Plaintiffs N.S. and S.S. *were effectively denied three years of schooling*. Plaintiff [sic] N.S. and S.S. may never catch up academically, *as the District is now refusing to provide schooling* to the girls past the age of 21 years old.

(Pls. Mem. in Opp. at 9 (emphasis added).) Accordingly, Plaintiffs' claims are subject to the IDEA's exhaustion requirement unless excused under the doctrine of futility.

**C. The IDEA's Futility Exception**

The IDEA's exhaustion requirement is inapplicable when "exhaustion would be futile because administrative procedures do not provide adequate remedies." *Polera*, 288 F.3d at 488 (quoting *Heldman v. Sobol*, 962 F.2d 148, 158 (2d Cir. 1992)); *see also Scaggs v. New York Dep't of Educ.*, 2007 WL 1456221, at *5 (E.D.N.Y. May 16, 2007). "In determining whether

plaintiffs should be subject to the exhaustion requirement, the Second Circuit instructs courts 'to consider whether administrative review would further the goals of developing facts, making use of available expertise, and promoting efficiency.' " *Polera*, 288 F.3d at 488 (quoting *J.S.*, 386 F.3d at 113). The party asserting futility bears the burden of proof that such an exception applies. *Id.*

The Second Circuit has recognized three exceptions in which the futility exception could arise. The first situation involves "complaints that . . . an agency has failed to provide services specified in the child's [IEP]." *See Polera*, 288 F.3d at 489 (quoting 131 Cong. Rec. § 10396–01 (1985); H.R. Rep. 99–296, at 7 (1985)). A court "must closely examine a plaintiff's claims" and apply the futility exception only in cases that "involve nothing more than [a failure of] 'implementation' of services already spelled out in an IEP.' " *See id.* Where, however, a plaintiff's claims involve a school district's "fail[ure] to spell out the services to be provided" in the first instance, the invocation of the futility exception is inappropriate. *See id.* (declining to apply futility exception when claims involved "both a failure to provide services and a significant underlying failure to specify what services were to be provided"); *Scaggs*, 2007 WL 1456221 at *6 (finding plaintiffs failed to invoke futility exception when they alleged that "defendants may not have provided the students with any IEP-plan whatsoever, rather than declining to implement services 'specified' or 'clearly stated' in IEPs that had already been created for the students").

A second basis for invoking the futility exception is the existence of "systemic violations" of the IDEA that cannot be "remedied by administrative bodies because the framework and procedures for assessing and placing students in appropriate educational programs were at issue, or because the nature and volume of complaints were incapable of correction by the

administrative hearing process." *J.S.*, 386 F.3d at 113–14 (collecting cases). To take advantage of the futility exception on this ground, a plaintiff must allege "wrongdoing that is inherent in the program itself and not directed at any individual child." *Id.* at 110 (internal quotation marks omitted).

The third basis for the futility exception is when the parents are not notified of the due process remedies available to them. *Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002). When a parent is not notified of the procedural due process remedies that are available, exhaustion of applicable administrative remedies is not required before commencing a lawsuit. *Id.; see also Piazza v. Florida Union Free Sch. Dist.*, 777 F. Supp. 2d 669 (S.D.N.Y. 2011); *Stropkay*, 2014 WL 6778397, at *3.

Plaintiffs allege that they were not notified of the procedural safeguards available to them to challenge the District's denial of S.S.'s and N.S.'s diagnoses and failure to properly evaluate and provide them with appropriate services. (Pls. Mem. in Opp. at 8; Compl. ¶¶ 46-49.)[2] Defendants, however, submitted with their moving papers correspondence addressed to L.K. and dated June 3, 2009 which enclosed a copy of the "Section 504 Procedural Safeguards" explaining her rights regarding the Section 504 process and further notifying her of her right to receive information relating to obtaining free or low-cost legal and other relevant services. (Radi Decl. Ex. C; *see also id*. Ex. B & D (referencing previously sent Procedural Safeguards Notice and stating an additional copy is available from the District if needed). Specifically, the Procedural Safeguards Notice states, in relevant part:

[2] The allegation that L.K. was not notified of procedural safeguard relates to the June 2009 Section 504 meeting. (Compl. at ¶¶ 46-49.) With respect to other CSE and 504 meetings referenced in the complaint, including those conducted after September 2011, there are no allegations regarding the lack of notification regarding procedural safeguards.

> Parents or persons in parental relationship who disagree with the identification, evaluation or placement of a student with disabilities shall have the right to request an impartial due-process hearing. the request for a hearing shall be made in writing, within thirty days of receipt of the Section 504 Committee's determination. . . . The Parent . . . shall have an opportunity to participate and be represented by counsel at the due process hearing. . . . The parent . . . shall be notified in writing of the hearing officer's decision. The school district or parent . . . may seek review by the commissioner of Education, or the State Review Officer, as appropriate, and by a federal court of competent jurisdiction.

(Radi Decl. Ex. C.)

As noted earlier, Defendants submitted the aforementioned correspondence and notice with their moving papers. In response, Plaintiffs did not submit an affidavit denying receipt or otherwise addressing this evidence. Rather, Plaintiffs rely solely on the allegation in their complaint that they were never informed of the administrative process. (*See* Pls. Mem. in Opp. at 8 (citing Compl. ¶ 49).) Plaintiffs have thus failed to sustain their burden of demonstrating futility on the ground they were not notified of their procedural due process remedies. *Cf. Rapoport v. Asia Electronics Holding Co., Inc.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) (where documents properly considered on a motion to dismiss contradict the allegations in a pleading, the court need not accept the allegations as true).

Having failed to exhaust their administrative remedies and to establish their claim of futility, Plaintiffs' ADA, Section 504, and 1983 Equal Protection claims are dismissed for lack of subject matter jurisdiction.

## IV. Statute of Limitations

A three year statute of limitations governs Section 1983, ADA and Section 504 claims. *See, e.g.*, *Stropka*y, 2014 WL 6778397, at *3; *Harris v. City of New York*, 186 F.3d 243, 247 (2d

Cir. 1999); *Pape v. Bd. of Educ. of the Wappingers Cent. Sch. Dist.*, 2009 WL 3151200, at *8 (S.D.N.Y. Sept. 29, 2009); *see also Puma-Grippe v. City of New York*, 2013 WL 4069471, at *8 (E.D.N.Y. Aug. 13, 2013). The applicable limitations period "begins to run at the time that a plaintiff learns or has reason to learn of the injuries that form the basis for his claim." *K.H. v. N.Y.C. Dep't of Educ.*, 2014 WL 3866430 (E.D.N.Y. Aug. 6, 2014); *Scaggs*, 2007 WL 1456221, at *5. In evaluating the date on which a federal cause of action accrues, "the proper focus is on the time of the discriminatory act, not the point at which the *consequences* of the act become painful." *See Morse v. Univ. of Vermont*, 973 F.2d 122, 125 (2d Cir. 1992) (emphasis in original) (citing *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980)).

Defendants contend that all of the acts complained of are time-barred because courts in the Second Circuit have declined to apply C.P.L.R. Section 208's minority tolling provision to IDEA-related claims, and have disfavored the application of the continuing violation doctrine to such claims. (Def.'s Mem. in Further Supp. at 2-3). Additionally, the last adverse action alleged in the complaint occurred on April 13, 2011, and the fact that N.S. and S.S. continued to be withdrawn from the District through October 15, 2011 is non-actionable, as it merely represents the residual effect of earlier time-barred acts. *Id.* Plaintiffs argue that N.S. and S.S.'s status as minors tolled the applicable statute of limitations for each cause of action until each of them reached the age of majority, and that the continuing violation doctrine is applicable to claims brought in an IDEA context. (Pl.'s Memo in Opp'n at 5-6; 11.)

While the Second Circuit has not directly addressed tolling in terms of infancy, it has declined to apply an equitable tolling provision to Rehabilitation Act claims, finding that the fundamental goals of the IDEA would be defeated if such claims were allowed to be brought

long after their accrual date and after any effective remedy could be provided. *M.D. v. Southington Bd. Of Educ*., 334 F.3d 217, 224 (2d Cir. 2003). "Federal courts must borrow a state's equitable tolling rules unless to do so 'would defeat the goals of the federal statute at issue.'" *Id*. (quoting *Hardin v. Straub*, 490 U.S. 536 (1989)).

The goal of federal statutes such as the IDEA, ADA and Rehabilitation Act is to provide students with the services they require as promptly as possible in order to avoid impairing their educational progress. *See*, *e.g*., *Piazza*, 777 F. Supp. 2d at 692. Consequently, courts both within and without this Circuit have held that applying a minority tolling provision in this setting would frustrate the goals of the ADA and Section 504. *See id.* (citing cases).

In this Circuit, the continuing-violation doctrine is “disfavored” and “is ‘applied only upon a showing of compelling circumstances.’ ” *Remigio v. Kelly*, 2005 U.S. Dist. LEXIS 16789, at *25–*26 (S.D.N.Y. Aug. 12, 2005) (quoting *Nakis v. Potter*, 2004 U.S. Dist. LEXIS 25250, at *30–*33 (S.D.N.Y. Dec. 15, 2004) (collecting cases). Courts in this Circuit have declined to apply the continuing violation exception to claims under the IDEA and Rehabilitation Act. *Scaggs v. New York Dept. of Educ.*, 2007 WL 1456221 (E.D.N.Y. 2007); *SJB ex rel. Berkhout v. N.Y.C. Dep't of Educ*., 2004 WL 1586500, at *7 (S.D.N.Y. July 14, 2004) (declining to apply “continuing violation” exception to statute of limitations for IDEA claims, noting “the concern of the IDEA is the prompt provision of necessary services as determined by knowledgeable professionals to disabled children.”)

As plaintiffs’ IDEA-related claims are not tolled by either by infancy or the continuing violation doctrine, those claims which accrued prior to September 30, 2011 are time-barred.[3]

[3] After September 2011, the allegations in the complaint relate to the District’s purported failure to develop a plan that will “allow the girls to graduate with a high school education.” See Compl. ¶¶ 137-158. As such a claim is

## VI. N.S.'s and L.S.'s Equal Protection Claims

As noted earlier, courts within this Circuit have held that, however framed, claims that are actually based upon the denial of a "free appropriate education" should be addressed through the IDEA. Plaintiffs' equal protection "class of one" claims are so based and thus subject to dismissal for failure to exhaust administrative remedies. In addition, they are subject to dismissal for failure to state a claim.

"The Supreme Court has 'recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " *Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 58 (2d Cir. 2010) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Plaintiffs asserting a "class of one" equal protection claim "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *See Ruston*, 610 F.3d at 59 (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir.2006)) (internal quotation marks and alteration omitted). Specifically, such plaintiffs "must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Id.* at 59–60 (quoting *Clubside, Inc.*, 468 F.3d at 159) (internal quotation marks omitted). "A class of one plaintiff must show an extremely high degree of similarity between themselves and the

---

based on her daughters' rights to a free and appropriate public education it is subject to the IDEA's exhaustion requirements discussed earlier.

persons to whom they compare themselves." *Ruston*, 610 F.3d at 59; *see also Prestopnik v. Whelan*, 249 Fed. Appx. 210, 213 (2d Cir. 2007) (a class of one plaintiff "must demonstrate that she was treated differently than someone who is prima facie identical in all relevant respects.") (internal quotations omitted). Here, plaintiffs have utterly failed to allege the existence of similarly situated comparators. Thus, plaintiffs' equal protection allegations fail to state a claim.

## VI. L.K.'s First Amendment Retaliation Claim

To prevail on a First Amendment retaliation claim, a plaintiff must prove "(1) [s]he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

Here, Plaintiff L.K. contends that as a result of informing Defendants about her daughters' disability on multiple occasions, Defendants retaliated against her for speaking out about a matter of public concern, in violation of the First Amendment of the United States Constitution. The alleged retaliatory acts consist of the CPS reports filed against L.K., including the increased intensity of such reports after L.K. filed an action against Defendants with the OCR. According to L.K. the harassing reports forced her to withdraw her daughters from the District in April 2011, yet "Defendants' retaliation of denying services continued until October 15, 2011 . . . when the girls were actually provided with proper home tutoring." (Pls. Mem. in Opp. at 14-15.)

While Plaintiffs do not provide the specific dates of the various CPS reports filed by Defendants, the complaint does allege that L.K. withdrew N.S. and S.S. from the District on April 13, 2011 in order to stop the District from filing these reports, and does not allege that any

additional CPS investigations were initiated thereafter. (Compl. 119; 123.) Plaintiffs do not set forth any specific retaliatory actions after April 2011; they simply claim a denial of services, which denial took place while the "the girls were still signed out of school." (Comp. ¶130; *see also* Pls. Mem. in Opp. at 15.) To the extent the alleged retaliation was the filing of reports with CPS, no such retaliation is alleged after April 2011 and therefore any 1983 claim based thereon is barred by the three year statute of limitations. *See, e.g. Stropkay v. Garden City Union Free Sch. Dist.*, 2014 WL 6778397, at *3 (2d Cir. Dec. 3, 2014); *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999). To the extent the "retaliation" was a denial of educational services, such a claim is based on her daughters' rights to a free and appropriate public education and therefore subject to the IDEA's exhaustion requirements discussed earlier.

## VII. Section 1985 and 1986 Claims

Defendants move to dismiss Plaintiff's Section 1985 and 1986 claims pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiffs assert that the individual Defendants, acting together, expressly or tacitly conspired against Plaintiffs to deprive them of their rights in violation of Section 1985, and are each liable for neglecting to prevent these wrongdoings, of which they had knowledge and the power to prevent, from being committed, pursuant to Section 1986. The Court will address each claim in turn.

### A. Section 1985 Claim

To succeed on a cause of action under Section 1985, a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right

or privilege of a citizen of the United States." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999); *see also Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 586-87 (2d Cir. 1988). Further, "[t]here must be some racial or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." *Griffen v. Breckenridge*, 403 U.S. 88, 102 (1971); *see also Thomas*, 165 F.3d at 146; *Gagliardi v. Vill. of Pawling*, 18 F.3d 188 (2d Cir. 1994). Conclusory, vague, or general allegations that defendants have conspired to deprive plaintiffs of their constitutional rights cannot withstand a motion to dismiss a Section 1985 claim. *See, e.g., McGee v. Doe*, 568 F. App'x 32, 35 (2d Cir. 2014); *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993). Rather, plaintiffs must provide a factual basis to support "a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003).

Defendants move to dismiss the Section 1985 claim on the ground that it is barred by the intracorporate conspiracy doctrine, as the individual Defendants are all employed by the same municipal entity-the Sewanhaka Central High School District. In addition, Defendants contend that the claim is time-barred, there is no underlying constitutional violation, and there is an absence of any evidence that Defendants acted with discriminatory animus.

Under the intracorporate conspiracy doctrine, "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978); *see also Cameron v. Church*, 253 F. Supp. 2d 611, 623 (S.D.N.Y. 2003) ("employees of a single . . . municipal entity . . . legally are incapable of conspiring together"); *Nassau County Employee "L" v. County of Nassau*, 345 F.

Supp. 2d 293, 304-05 (E.D.N.Y. 2004); *Quinn v. Nassau County Police Dep't*, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999); *Girard v. 94th and 5th Avenue Corp.*, 530 F.2d 66, 71 (2d Cir. 1976).

Plaintiffs list the specific, independent actions assumed by each individual Defendant-ranging from Sanzone's alleged failure to inform Plaintiffs of the administrative process, to Russo's instruction that N.S. was suffering from depression, to Oris's medical evaluation-and argue that each of these acts were in furtherance of the Defendants' conspiracy to deny N.S. and S.S.'s diagnosis and ultimately, their right to a proper education. However, these are all acts undertaken by the District's employees in the performance of their respective duties within the District. Accordingly, the Section 1985 claim is barred by the intracorporate conspiracy doctrine. Because the Court finds Plaintiffs' 1985 claim barred by the intracorporate conspiracy doctrine, it need not address the other grounds raised by Defendants.

**B. Section 1986 Claim**

Section 1986 provides that any "person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured . . . ." It is well established that a Section 1986 claim is contingent upon a valid Section 1985 claim, as the former provides a remedy for a violation of the latter. *See, e.g., Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 2000) ("[A] § 1986 claim must be predicated on a valid § 1985 claim . . . ."). Consequently, Plaintiffs' Section 1986 claim also fails because Plaintiffs have not alleged a valid Section 1985 claim, and no actionable conspiracy existed. *Cameron*, 253 F. Supp. 2d at 623 (S.D.N.Y. 2003).

## VIII. Common Law Fraud and the Requirement of a Notice of Claim

Section 3813(2) of the Education Law provides in relevant part:

> No action . . . founded upon tort shall be prosecuted or maintained against any of the parties named in this section [which includes School Districts] or against any teacher or member of the supervisory or administrative staff or employee where the alleged tort was committed by such teacher, or member, or employee acting in the discharge of his duties within the scope of his employment and/or under the direction of the board of education, trustee or trustees, or governing body of the school unless a notice of claim shall have been made and served in compliance with section fifty-e of the general municipal law.

N.Y. Educ. Law § 3813(2).

New York General Municipal Law 50-e, which is referenced in § 3813, requires that a plaintiff must file a notice of claim prior to commencement of an action against a municipality, and must serve the notice of claim within ninety (90) days after the claim arises. N.Y. Gen. Mun. Law § 50-e. It is well settled that compliance with Education Law § 3813 is a condition precedent to commencement of an action against a school district and/or its employees. *P.J. Panzeca, Inc. v. Bd. of Educ., Union Free Sch. Dist. No. 6,* 29 N.Y.2d 508 (1971). State law fraud claims are subject to New York's notice of claim requirement. *See*, *e.g.*, *Sandy Hollow Assoc.*, 2010 WL 6419570, at *17; *Christian v. Town of Riga*, 649 F. Supp. 2d 84, 92 (W.D.N.Y. 2009); *Crippen v. Town of Hempstead*, 2009 WL 803117, at *15-16 (E.D.N.Y. Mar. 25, 2009); *Van Cortlandt v. Westchester County*, 2007 WL 3238674, at *8 (S.D.N.Y. Oct. 31, 2007). "The notice of claim requirements apply equally to state tort claims brought as pendent claims in a federal civil rights action." *Warner v. Village of Goshen Police Dept.,* 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003).

The burden is on the plaintiff to plead and prove compliance with the requirements of § 3813. *Panzeca,* 29 N.Y.2d at 508; *Stoetzel v. Wappingers Cent. Sch. Dist*., 166 A.D.2d 643, 644 (2d Dept. 1990). A complaint that "fails to allege compliance with Education Law § 2813 is fatally defective." *Id.*

The complaint does not allege that Plaintiffs served a notice of claim. Therefore, Defendants' motion to dismiss Plaintiffs' common law fraud claims against both the District and the individual Defendants is granted.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is granted. The Clerk of Court is respectfully requested to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
July 16, 2015

/s/
Denis R. Hurley
Senior District Judge